Brandon J. Harrison, Judge, dissenting.
*495 This case plumbs the depths of counties' governmental structures, their operations, and the delegation of power-such as how quorum courts share power with administrative boards-and what it all means for the APERS board's decision that former employees of three separate nursing homes, across three counties, failed to meet threshold requirements for inclusion in the State's public employee retirement system. On whether the petitioners should have been included in APERS, I would hold that the board's denial is wholly inadequate under the Administrative Procedure Act, which is to say that it is clearly wrong. The board's decision should therefore be reversed, and the case remanded for further proceedings. Because the majority has determined otherwise, I respectfully dissent.
I. The APERS Board Misapplied the Statutory Definitions
The majority essentially maintains that the APERS board correctly decided that three separate statutory definitions had to be satisfied, simultaneously, before the former employees could have been included in APERS. Specifically, the majority today holds that the employees had to satisfy Arkansas Code Annotated sections 24-4-101(14), (17), and (27), at the same time, to be included in the retirement system. I disagree. The Arkansas General Assembly's acts have never created the "conjunctive" (serial) phrasing in section 24-4-302-the statute that the board and the majority have mistakenly used to morph three independent definitions into one. See Ark. Code Ann. § 24-4-302 (Repl. 2014). As I will show, a real disconnect occurred between what the General Assembly enacted over the decades and what the code revisors placed into Title 24, Chapter 4 of the Arkansas Code Annotated.
Here is the part of section 24-4-302, with my emphasis, that helped launch years of litigation, generated a twenty-volume record in this court, and ended in a mistaken application of APERS law:
All counties in this state shall be subject to the provisions of this act as participating public employers, and all counties shall, from and after July 30, 1959, include their employees, as defined in § 24-4-101(14), (17), and (27) , in the membership of the Arkansas Public Employees' Retirement System, except as follows[.]
That is what the statute says. But has any legislative act anywhere in APERS's history (1957-present) created the serial and conjunctive syntax (bolded above) on which so much has turned?
First, Act 303 of 1971, because it is the act from which section 24-4-302 was primarily but imperfectly drawn. Act of Mar. 16, 1971, No. 303, § 1, 1971 Ark. Acts 755, 755-56.[1] Here is the relevant part of Act 303 of 1971, again with my emphasis on the key phrase:
*496 SECTION 1. Subsection B of Section 6 of Act 177 of 1957, as amended, is hereby amended to read as follows:
"B. All counties in this State shall be and hereby are made subject to the provisions of this Act as participating public employers, and all said counties shall from and after July 30, 1959, include their employees as defined in subsection 1 E hereof , in the membership of the system, except as provided below[.]
Observe that an express reference to section 24-4-101(14), (17), and (27) in a conjunctive syntax is not in Act 303. There is, however, a cross-reference to "subsection 1 E hereof."
Where does Act 303's internal reference to "subsection 1 E hereof" take us? That bland cross-reference does not tell us much, substantively speaking. To learn what "subsection 1 E hereof" means substantively, we must go back in time.
Enter Act 64 of 1961. Act of Feb. 8, 1961, No. 64, 1960-61 Ark. Acts 132, 132-33. Act 64 created for the first time the definitions "County employees," "Non-State Employees," and "Municipal Employees." Id. at 133-35. (A definition of "County" first appeared in Act 42 of 1959, and it reappeared in Act 64 of 1961 with no meaningful change having taken place.) Act of Feb. 13, 1959, No. 42, § 1, 1958-59 Ark. Acts 135. Following are the pertinent provisions of Act 64. The italicized subsections denote the definitions that Act 64 of 1961 added to the 1959 version of APERS:
SECTION 1. That Section 1 of Act 177 of 1957, as amended by Act 42 of 1959, be, and the same is hereby amended to read as follows:
SECTION 1. The following words and phrases as used in this Act, unless a different meaning is clearly indicated by the context, shall have the following meanings:
...
(b) "County" means any county in the State and shall include all agencies, offices, departments, boards, commissions, and county institutions that are duly constituted agencies of the county[.]
...
E. (c) "Non-State Employees" means county employees and municipal employees.
(d) "County Employees" means all employees whose compensations are payable either directly or indirectly by a county participating public employer or employers, and shall include official court reporters and stenographers of the Circuit Courts and Chancery Courts.
(e) "Municipal employees" means all employees whose compensations are payable either directly or indirectly by a municipal participating employer or employers, and shall include employees of the Municipal League.
(f) In any case of doubt as to who is an employee, or who is a State employee, or a county employee, or a municipal employee, within the meaning of this Act; the Board shall have the final power to decide the question.
The italicized subsections I have listed above are the ones Act 303 of 1971 cross-referenced with its "subsection 1 E hereof" notation.
There are three main things to notice at this point. First, Act 64 of 1961 created the definitions that are now sections 24-4-101(14)(A) "County employees" and -101(27) "Non-State Employees." Ark. Code Ann. § 24-4-101 (Repl. 2017). Second, Act 64's definitions of county employees, employees, and nonstate employees are the ones that Act 303 cross-referenced using its "subsection 1 E hereof" notation. Finally, *497 and most importantly, neither Act 64 of 1961 nor Act 303 of 1971 contains the conjunctive syntax that now appears in section 24-4-302-the statute on which the APERS board relied to conclude that section 24-4-101(14), (17), and (27) must all be simultaneously met before an employee can be a county employee and welcomed into the APERS system. Ark. Code Ann. § 24-4-302.
A. Employees or County Employees
Let us focus on subsection (17)'s "Employees" and try to understand why it has caused so much trouble. The definition is important because employee status under subsection (17), in this case's context, requires a county quorum court to set aside a sum of money for a specific purpose (that is, to make an appropriation).
Looking back in time from 1959 until 1961, it appears that the definition of "Employees" would have been applied with the definition of "County" when determining who was a county employee. It used to make good sense to read the two definitions together. But for whatever reasons the legislature chose to change how to classify persons who might be counted as county employees for APERS purposes. To that end, the legislature added, for the first time in 1961, a specific definition of "County employees." Act of Feb. 8, 1961, No. 64, 1960-61 Ark. Acts 132, 135. With the specific definition of "County employees" in place there was no longer a need to use the more general "Employees" definition.
The General Assembly acted again in 1991. In that year, it "amended" the term "County employees." Here is all of Act 331 of 1991:
AN ACT to Amend Title 24, Chapter 4, Subchapter 1 of the Arkansas Code of 1987 to Change the Definition of County Employee Under the Arkansas Public Employees Retirement System; and for Other Purposes.
Be It Enacted by the General Assembly of the State of Arkansas:
SECTION 1. Subsection 10 of Arkansas Code 24-4-101 is hereby amended to read as follows:
(10) "County employees" means all employees whose compensations are payable, either directly or indirectly, by county participating public employers and includes employees of the Association of Arkansas Counties, and official court reporters and stenographers of the circuit courts and chancery courts. In any case of doubt as to who is a county employee within the meaning of this act, the board shall have the final power to decide the question;
SECTION 2. Effective July 1, 1991, all current employees of the Association of Arkansas Counties shall elect within thirty (30) days whether to become a member of the Arkansas Public Employees Retirement System. Thereafter, all newly hired employees of the Association of Arkansas Counties shall become members of APERS.
SECTION 3. All provisions of this act of a general and permanent nature are amendatory to the Arkansas Code of 1987 Annotated and the Arkansas Code Revision Commission shall incorporate the same in the Code.
SECTION 4. If any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.
*498 SECTION 5. All laws and parts of laws in conflict with this act are hereby repealed.
SECTION 6. EMERGENCY. It is hereby found and determined by the Seventy-Eighth General Assembly of the State of Arkansas that the effectiveness of this act on July 1, 1991, is essential to the operation of the Arkansas Public Employees Retirement System and that in the event of an extension of the Regular Session, the delay in the effective date of this act beyond July 1, 1991, could work irreparable harm upon the proper administration and provision of essential governmental programs. Therefore, an emergency is hereby declared to exist and this act being necessary for the immediate preservation of the public peace, health and safety shall be in full force and effect from and after July 1, 1991.
APPROVED: 3-4-91
The 1991 amendment is virtually identical to the "County employees" definition the legislature enacted in 1961. And like its predecessors, Act 331 of 1991 did not create the conjunctive syntax-"All counties ... shall ... include their employees, as defined in § 24-4-101(14), (17), and (27)"-on which the board and this court have so relied. Ark. Code Ann. § 24-4-302 (emphasis added).
Having flyspecked APERS's statutory history, I am convinced that the perceived conjunction "and" that the board used to decide this case is a slip of the codifier's pen that occurred when moving from legislative act to code book. "Codification is, in the main, restatement." Benjamin N. Cardozo, A Ministry of Justice , 35 Harv. L. Rev. 113, 117 (1921). But section 24-4-302 as codified does not accurately restate the legislative changes that have been made to the rather complex, reticulated, cross-referential statutory scheme that is the Arkansas Public Employee Retirement System.[2] "The only truly authentic text of a statute is the exact wording of the act in the form in which it passed both houses of the legislature and was either approved by executive or passed over his veto." Norman Singer & Shambie Singer, 2 Sutherland Statutory Construction § 36A:1 (7th ed.) (Nov. 2018 update); see also Ark. Code Ann. § 1-2-303(d)(1) (Repl. 2017) (stating that the code revisors "shall not authorize any change in the substance or meaning of any provision of the Arkansas Code or any act of the General Assembly. The bureau [of legislative research] shall not change the substance or meaning of any provision of the Arkansas Code or any act of the General Assembly.").
Not only does the APERS board's approach of combining definitions lack express support in the acts themselves, it creates a conflict. The conflict arises because injecting (17)'s appropriation requirement into (14)(A) adds a material element to the definition of county employees that the legislature has never enacted throughout the history of APERS. The word "appropriation" simply does not appear in 14(A)'s "County employees" definition. Nor is it contextually required so that (14)(A) makes sense. All that is required under (14)(A) is that a county employer must have compensated the petitioner indirectly or directly. Ark. Code Ann. § 24-4-101(14)(A) ("County employees" means all employees whose compensations are payable, either directly or indirectly, by county participating public employers and *499 includes employees of the Association of Arkansas Counties.) The answer is that straightforward.
Moreover, the APERS board's-and now the majority's-mix-and-match error leads to an interpretive absurdity, a signal that something is amiss. What is the point of having 14(A)'s "compensations[3] payable directly or indirectly by a county employer" query if a petitioner must always and simultaneously prove , under (17), that his or her compensation flowed from a quorum court appropriation? That reading renders (14)(A)'s indirect-compensation element wholly useless. And it makes (14)(A)'s "County employees" direct-compensation element needlessly repetitive to (17)'s "Employees" appropriation element. See Ark. Code Ann. § 24-4-101(17)(A)(i)(a) ("Employees" means all officers and employees of any office, agency, board, commission ... of a public employer whose compensations were or are payable from funds appropriated by the public employer).
So practically speaking, the APERS board's approach essentially erases the more specific definition of "County employees" from the books. Under the board's and now this court's view, a petitioner must always meet (17)'s definition of "Employees" to be eligible for membership in APERS. If he or she does so, then (14)(A) will necessarily be satisfied. But if (17) is not satisfied, then no petitioner can ever meet (14)(A)'s definition. Why have (14)(A) at all if the answer to (17) will always determine the answer to (14)(A), too?
We can avoid the conflict and the resulting erasure by accepting that (14), (17), and (27) are separate and distinct definitions and should be applied that way. The APERS board chose otherwise and thereby allowed section 24-4-101(17)'s definition of employees to drive the case off course. All the problems could have been avoided, however, if the board had focused on the definition of county and county employees in subsections -101(13) and -101(14)(A). By applying the specific county definitions, the board could have avoided the clear legal error it made by letting the more general definition control the more specific and more modern definition.
B. Compensation
The APERS board did not ask and answer the critical question of whether the petitioners' "compensations [were] payable, either directly or indirectly" by the counties, as they acted through the administrative boards. Ark. Code Ann. § 24-4-101(14)(A). In other words, the board did not decide whether the petitioners were compensated as county employees apart from a quorum-court appropriation.
In my view, the three nursing home boards are by statutory definition county actors. Ark. Code Ann. § 24-4-101(13) (defining "County" under APERS); see also Ark. Code Ann. § 14-14-705(b)(2)(A) (Repl. 2013) (authorizing county administrative boards); Ark. Code Ann. §§ 14-14-101 to -1313 (county government code). Everyone agrees that the facilities at issue are, in fact, operated by the administrative boards. Specifically, there is uniform agreement that all three county administrative boards (Craighead, Union, and Lawrence) hire the staff, fire the staff, decide bonuses for the staff, deal with posttermination issues regarding the staff, sign off on the paperwork needed to maintain licenses with the Office of Long-Term *500 Care, approve operating budgets, fix leaky pipes, report on the availability of beds in the facilities, handle the bank accounts and investments generated by the money received from the patients or entitlement programs, manage residents' experiences within the facilities (including planning the occasional holiday party), oversee expansion and repair of the facilities, procure different types of insurance for the facilities (liability and workers' compensation), and on and on.
Just ? the boxes: as for law, the definition of county in APERS includes all county boards, which necessarily includes county administrative boards. As to fact, the administrative boards act in the world with the full weight and authority of the counties behind them. And all three facilities' county administrative boards hire, fire, manage, and pay the staff, as well as operate the facilities in every other respect; therefore, the only realistic answer to the questions-"For whom do the employees work? Who paid them?"-is that they worked for and were paid by the counties.
Finally, we come directly to the patient-revenue issue and what it means to whether a petitioner qualifies for APERS membership, a point that will be touched on again in Section II, below. Here we must ask from what source did the administrative boards pay the nursing-home staff as well as the facilities' operating and maintenance expenses? More to the point, the APERS board has not yet asked and answered whether the facilities' patient-revenue streams satisfy sections 24-4-101(11)(A) "Compensation," 24-4-101(13) "County," and 24-4-101(14)(A) "County employees." It did not do so because it applied the wrong statutory definitions and therefore strayed from the correct analytical path.
Because the board failed to apply the more specific definition of county employees, I would reverse the board's order and remand the case. On remand, the board should decide whether the petitioners were county employees without resorting to section 24-4-101(17), which is inapplicable. More specifically, the board should be directed to answer whether the petitioners were indirectly or directly compensated by the counties within the meaning of section 24-4-101(11)(A), (13), and (14)(A) on this developed evidentiary record.
II. The APERS Board's "Opt-Out" Ruling Should Be Revisited
Here is the pertinent part of the opt-out statute, section 24-4-302(5), titled "County employees included-Exceptions." The emphasis is mine:
All counties in this state shall be subject to the provisions of this act as participating public employers, and all counties shall, from and after July 30, 1959, include their employees, as defined in § 24-4-101(14), (17), and (27), in the membership of the Arkansas Public Employees' Retirement System, except as follows:
....
(5) A nursing home, assisted living facility, or healthcare facility that is:
(A) Owned but not operated by a county may elect by a vote of at least two-thirds ([2]/3) of its governing body to exclude employees of the facility from membership in the system but only if the election is certified to the board within one (1) year from March 25, 2011; and
(B) Constructed or acquired by a county after March 25, 2011, but not operated by a county may elect by a vote of at least two-thirds ([2]/3) of its governing body to exclude employees of the facility from membership in the system but only if the election is certified to the board within one (1) year *501 from the date of the beginning of operations after construction or acquisition.
I do not take issue with the board's deciding (as it must have done) that the three facilities' administrative boards held a vote to opt out of APERS and received enough votes to meet the statute's two-thirds threshold. The petitioners dispute whether enough votes were received from one or more of the board members; but I can defer to the board here given my review of the record. The APERS board has a more basic problem than whether it correctly pieced together the opt-out voting history from the administrative boards' minutes and the affidavits filed by their members.
In paragraph six of its "Findings of Fact" section, the APERS board makes an incorrect conclusion on a mixed question of fact and law. The board's conclusion with which I take issue is, "All three nursing homes invoked and complied with Act 737 of 2011." The three facilities' administrative boards most assuredly invoked the Act's opt-out provisions. See Act of Mar. 25, 2011, No. 737, § 1, 2011 Ark. Acts (now codified at Ark. Code Ann. § 24-4-302(5) (Repl. 2014)). But the opt-out statute applies only to county-owned facilities that are not county operated. No one has contested that all three facilities are county owned. But is any one of them, or all three of them, county operated?
To answer this question, we might simply fall back on what has already been established: the administrative boards are essential county actors that have operated and managed the facilities day in and day out, year after year; therefore, the facilities are county owned and county operated (by the administrative boards). This would in turn mean that sections 24-4-302(5)(A)-(B)'s opt-out provisions cannot be applied. The promises that Lawrence and Craighead Counties made in certain bonds is material evidence that bears on the question of how much operational and administrative control the respective quorum courts can and do exercise over the homes. Put in the form of a question: to what extent, if any, do the bonds help determine whether the homes were county operated? Going deeper into the record will not only help answer that question, it will also shine light on whether the facilities' revenue streams might meet the "compensation" element in APERS, a point the board should be directed to address on remand.
Below are some important points that the petitioners raised consistently, and which the board and the majority have not sufficiently addressed. The material appears in no order of importance, and in what can only be a summary manner given the voluminous (but often repetitive) record.
A. Lawrence County
1. The revenue bonds
Neither this court nor the APERS board delved into an important facet of the facilities' entanglement with county governmental operations-the role revenue bonds[4] have played and what they reveal about the nexus between the county quorum *502 courts, the nonprofit facilities, and the money they generate. The APERS board and the majority opinion believe the bonds are mere tools for capital-improvement projects. I respectfully disagree.[5]
For example, a Lawrence County Hospital and Nursing Home Revenue Bond Series 2004 Bond, Section 16, states: "County covenants and agrees that it will maintain the Organization and will operate the Organization in an efficient manner and at reasonable cost. " (The emphasis is mine.) How can a county promise to maintain and operate a facility in a bond and then later contend it does not operate the same facility for section 24-4-302(5)'s purpose?
Here is more language from that revenue bond that the quorum court of Lawrence County blessed, with my emphasis,
It is further ... agreed by the County ... that the county will maintain public liability insurance covering the county's ownership and operation of the organization with maximum liability limits ... [and] agrees to carry workman's compensation insurance for all its employees[.]
Similar question as the one before: how can a quorum court promise to carry different types of insurance, including workers'-compensation insurance on "all its employees," and liability insurance covering "the county's ownership and operation of the organization"-that is, the Lawrence County facility at issue in this case-in a bond and then contend later that it (the county) does not operate the same facility?
Section 24 states that the bond ordinance is a "binding contract between the County and the registered owner(s) [of the bond]." Section 25(a) states that Lawrence County cannot operate or allow the facility (the nursing home) to be used in a manner that would render it a "private activity bond" under the IRS Code.[6] The county's agreement regarding private-bond activity favors an inference that the nursing home is county operated.
To sum up: the county expressly promised to manage and operate the nursing home within certain parameters as a condition to receive investors' money. The APERS board should be directed to reevaluate Lawrence County's opt-out decision and explain why it gave the bonds short legal shrift.
2. The administrative board's minutes
Regarding Lawrence Hall Nursing Center's administrative board, the record contains minutes of a meeting when the board members talked about amended bylaws and articles of incorporation "were made to clarify ownership of Lawrence Hall as to county entity." Why a clarification of ownership was needed in the first place, and what changes if any were made, and when and to which documents, was not established as best I have been able to tell.
B. Craighead County
1. The revenue bonds
Section 3 of a revenue bond the quorum court in Craighead County issued in April 1990 states that the county has pledged what it says is "revenues derived from revenues collected by the county for nursing and care of patients at CNC." Included also is an operational and maintenance provision that funds the nursing center's operation first before paying the debt.
*503 (This is a flow-of-funds provision that is explained in my footnote four.)
Some additional sections in the March 1990 bond arguably show that there is no meaningful legal separation between the administrative board and the seat of county government (the quorum court). If there was a material separation between the two, then how can the quorum court make the binding promises that appear in the bond, which include: the promise that the county will raise the rates charged at the facility if the need arises; the revenue collected by the facility must be deposited in an account in the county's name; and the county will direct how the collected revenue will be applied (as directed by the bond's flow-of-funds provisions).
Section 5. The County covenants and agrees that the rates charged for the care of patients at the Facility shall never be reduced while any of the Bonds are outstanding and that, if necessary to meet the scheduled payments of principal and interest, the rates charged will be increased to produce net revenues ... which are at least equal to each year's required payments of principal, premium, if any, and interest on the Bonds.
Section 6. The Administrator of CNC shall be custodian of the gross revenues derived from Facility revenues. All moneys received by the Administrator shall be deposited by him in such depository or depositories for the County as may be lawfully designated from time to time by the County; subject, however, to the giving of security as now or as hereafter may be required by law, and provided that such depositories shall hold membership in the Federal Deposit Insurance Corporation. All deposits shall be in the name of the County and shall be so designated as to indicate the particular fund to which revenues belong[.]
Section 7. (a) All revenues derived from Facility revenues shall be paid by the County into a special fund hereby created and designated "CNC Revenue Fund" the ("Revenue Fund"). The revenues in the Revenue Fund shall be applied by the County as provided herein.
(b) There shall first be paid from the Revenue Fund into a fund hereby created and designated "CNC Operation and Maintenance Fund" (the "Operation and Maintenance Fund"), on or before the first day of each month while any Bonds are outstanding, sufficient money to pay all of the monthly operating expenses and to make reasonable provision for the repair and maintenance of the Facility.
....
(d) There is hereby created and ordered to be established a fund to be designated "Revenue Reserve Fund" the ("Reserve Fund"). Contemporaneously with the delivery of the Bonds, the County shall, from Facility Revenues on hand, deposit an amount into the Reserve Fund equal to the sum of the next 12 months' debt service payments[.]
These sections make a hard point against the APERS board's position that the facility was not county operated. As with Lawrence County, the most important point here is that the APERS board should be directed to expressly address what significance, if any, the bond provisions have before concluding, as it did in its order, that the facility is county owned but not county operated and therefore subject to section 24-4-302(5)'s opt-out provisions.
2. The audit and the board minutes
Let us move away from revenue bonds and to an accountant's audit. An independent auditor's report from Craighead Nursing Center states that it "audited the accompanying financial statements of *504 Craighead Nursing Center, a component unit of Craighead County, State of Arkansas" for the years 2011-12. Beyond the statement that the facility is part of the government-if that is an unfair inference to make, then no party has explained why it is-much more cannot be gleaned from the audit. What is clearer, however, is that the facility experienced what may fairly be called an identity crisis. Minutes to one board meeting held in 2000 report that the administrative board received "a preliminary report regarding [Mr. Hurst's] research into the legal status of the nursing home center. ... He estimates it will take several months to resolve the issue of corporate status and any related corporate entities." It is also reported in the minutes that "Mr. Burrow also raised a concern regarding employees. From a legal standpoint, he wonders whether they are technically employed by the nursing home or the county. " (The emphasis is mine.)
3. The long-term care license
Craighead County Nursing Home's long-term care facility license (2012-13) states, "THIS IS TO CERTIFY THAT County Government Doing Business As Craighead Nursing Center" operates and maintains the facility. If the county is not operating the facility, then why is the license issued to the county? The APERS board has not pointedly explained the significance (or lack thereof) of this fact, one that applies to all three homes.
C. Union County
1. The audit
According to an audit of Hudson Memorial Nursing Home (HMNH) by an accounting firm, HMNH is "a component unit of the County of Union, Arkansas." The independent audit also states, "The County (Union County, Arkansas) is responsible for the component unit's debts and is, therefore, entitled to its surpluses." The same audit further recites, "The responsibility and accountability over all funds is vested in county management; i.e., the County Judge appoints the Board of Governors." And note, too, how the audit expressly declares that the money the facility generates is invested in accord with state laws that govern how public funds must be invested. The emphasis is once again mine:
Hudson Memorial Nursing Home, a component unit of the County of Union, Arkansas, maintains cash deposits and cash equivalents.... Investments in U.S. bonds are also made. Generally state laws require that county funds be deposited in federally insured banks located in the State of Arkansas. These deposits may be in the form of checking accounts, savings and/or time deposits. Public funds may also be invested in direct obligations of the United States of America and obligations on which principal and interest are fully guaranteed by the United States of America.
What I tend to take from this excerpt is that a certified public-accounting firm has opined, pursuant to an independent audit, that surplus money from the facility's operation is public money. Let us pause here to ask: if a surplus of money that consists of patient revenue and entitlement-program sources is the county's money, then the same sources that generated the surplus in the first place must also belong to the county, yes? If not, why not? And if the patient-revenue streams are a primary source of money from which the homes' employees were paid, then they were paid with county money, yes? If not, why not? The final takeaways from the audit are that "county funds," not private funds, were invested in a manner that complied with state laws that govern the handling of "public funds"; and the administrative *505 board that operates the home is deeply entangled with county governmental operations. The APERS board's silence on these seemingly undisputed facts, and their potential legal significance in this case, should not be overlooked.
2. HMNH's employee handbook
Here is an excerpt from the facility's own 2004 employee handbook. "The HMNH is owned by Union County, Arkansas. A Board of Governors, of 7 local persons, each serving 7-year terms, appointed by the County Judge, is responsible for the operation of the home." The facility is admittedly owned by the county. But is it operated by the county, too? This handbook suggests that the nursing home represented that Union County is its owner-operator, an inference in this record that the board avoided addressing.
3. The long-term care licenses and applications for license renewal
There is more information that the board has not yet addressed on the question of whether the Union County's facility is county owned and county operated. The licenses of operation (so-called "wall licenses") that the Arkansas Department of Human Services has issued to the facility are in the name of "County Government Doing Business As Hudson Memorial Nursing Home." And some of the applications for license renewal state, in the entity-name blank in the form, "County Government." In some forms, this notation is handwritten in after someone had stricken through a typewritten entry of "Hudson Memorial Nursing Home." The renewal applications add to the evidentiary mix that the facility is county owned and county operated.
The APERS board stated that the three facilities in this case successfully opted out of APERS under Arkansas Code Annotated section 24-4-302(5). Given the inadequate fact-finding the board offered on this vital issue, I would reverse its decision and remand for further proceedings.
III. Conclusion
The court today mistakenly affirms an APERS board decision that is inadequate under the Administrative Procedure Act. Not only is there a clearly wrong application of important statutes that define who is or is not a county employee, the board also failed to address important legal and evidentiary points that directly touch on whether the petitioners were compensated indirectly or directly by the counties and whether the facilities were county operated.
For these reasons, I would reverse the APERS board's decision and remand for further proceedings.

"The Arkansas Public Employees Retirement System was created by Act 177 of 1957. The System originally provided only for the retirement of State employees but through the years has added county employees (Act 42 of 1959), municipal employees (Act 64 of 1961), college and university employees (Act 149 of 1963), non-teaching public school employees (Act 63 of 1965)[.]" Ark. Pub. Employees Ret. Sys., Contribution Handbook , at 10 (2011) http://www.apers.org/images/PDFs/Contributory-Handbook.pdf. Elsewhere in the same handbook there is this colloquy: "Q. May employees of public groups other than the State participate? A. Yes, counties and state-supported colleges and universities are required by law to be participants." Id. at 13.

I question why the APERS board is owed deference in this case for essentially the same reasons raised in the concurring opinion in Brigman v. City of West Memphis , 2013 Ark. App. 66, at 5-7, 2013 WL 457909 (Harrison, J., concurring). Nonetheless, having deferred as the law currently requires, I still believe the board's decision is clearly wrong.

Compensation means the recurring remuneration paid a member by public employers for personal services rendered by a member in a position covered by an employer participating in APERS. Ark. Code Ann. § 24-4-101(11)(A).

The revenue bonds contain flow-of-funds provisions. Simply stated, these provisions direct the order in which the money collected from the facilities' revenue streams will be used. The bonds direct that the maintenance and operational costs (including employees' salaries) will be paid first from the pledged revenue stream. Then it (the pledged revenue stream) is directed toward debt payoff and interest payments-after paying the operation of the public works project that the bond seeks to improve. This makes sense because if the venture becomes less profitable or folds under, then the revenue stream diminishes or disappears altogether.

I have included a bond discussion for only Lawrence and Craighead Counties. If Union County produced a similar bond, then I have regrettably overlooked it in the record.

See IRS Office of Tax Exempt Bonds, Publication 4078 Tax-Exempt Private Activity Bonds , 6 (2016) https://www.irs.gov/pub/irs-pdf/p4078.